In re Michael J. GAVITA and Leslie E. Gavita, Debtors.

UNITED STATES TRUSTEE, Movant,

v.

Michael J. GAVITA and Leslie E. Gavita, Respondents.

Bankruptcy No. 94–21688–BM.
Motion No. 94–1421M.

United States Bankruptcy Court,
W.D. Pennsylvania.

Dec. 27, 1994.

Kathleen Robb–Singer, Office of U.S. Trustee, Pittsburgh, PA.

Kenneth Steidl, Steidl & Steinberg, Pittsburgh, PA, for debtors/respondents.

Joseph J. Bernstein, Bernstein & Bernstein, P.C., Pittsburgh, PA.

## *MEMORANDUM OPINION*

BERNARD MARKOVITZ, Bankruptcy Judge.

Several matters are before the court at this time.

The United States trustee argues that granting debtors relief would be a substantial abuse of chapter 7 of the Bankruptcy Code and has moved to dismiss debtors' chapter 7 petition pursuant to § 707(b) of the Code. Debtors oppose the motion and deny that granting such relief would constitute substantial abuse.

Debtors in turn have moved to amend Schedule I and Schedule J of their petition to reflect an alleged decrease in their net monthly income and a decrease in certain anticipated monthly expenses.

The United States trustee's motion will be granted. In light of this outcome, it will not be necessary to address debtors' motion to amend. By way of amplification, the court, after a review of the record, is of the distinct impression that the schedules, including the

budget, were put together by merely placing numbers in slots. In matching the testimony with the writings we feel confident that little effort was expended pursuing accuracy. These amendments bolster that impression wherein numbers are reduced in income and, thereafter, numbers are reduced in the budget. We have no feeling of confidence as to accuracy.

–I–

## FACTS

Debtors have been married since April of 1991 and have a daughter who was born in December of 1992.

Michael Gavita has been employed since 1980 as a truck driver on a full-time basis by the City of Pittsburgh. He also has been employed on a part-time basis since 1992 as a service station attendant.

The record does not disclose much information relating to gross income and even less relating to deductions. We are left to wonder why this information was not disclosed. We do have evidence and/or testimony which, while inconsistent, does indicate that Mr. Gavita's bi-weekly net take home from the City of Pittsburgh in 1994 ranged between $517.71 and $696.66. His testimony indicated that his monthly net pay during that period ranged from $1477.00 and $1700.00. Mr. Gavita further testified that his net pay from his job as a service station attendant during that same period approximated $90.00 per week or $381.00 per month.

Leslie Gavita was unemployed until 1992, when she began working on a part-time basis for Burlington Coat Factory. Her net income during that time was approximately $400.00. She began working on a full-time basis in October of 1993. Her monthly take-home pay since then has been approximately $900.00.

Debtors aver their combined gross income for 1992 was approximately $29,000.00. In 1993 it was $37,389.00. Their combined gross income for the first six months of 1994 was $17,307.61.

Debtors filed a voluntary joint chapter 7 petition on May 23, 1994. A chapter 7 trustee was appointed immediately thereafter.

Amended schedules and statement were filed on June 7, 1994. The schedules and statement list total assets of $73,800.00 and total liabilities of $106,886.00.

Schedule A, Real Property, lists debtors' marital residence with a declared fair market value of $60,000.00. Michael Gavita purchased the residence in 1990 for an undisclosed price, approximately one year before debtors were married. The property is now apparently owned by debtors as tenants by the entirety and is subject to secured claims in excess of its declared value.

Schedule B, Personal Property, lists assets having a declared total value of $13,800.00. Included among the items listed are the following:

| | |
|---|---:|
| Checking Account | $ 300.00 |
| Household Goods | 3,000.00 |
| Clothing | 200.00 |
| Jewelry | 2,000.00 |
| Firearms | 1,800.00 |
| Pension | 0.00 |
| Automobile | 500.00 |
| Truck | 2,000.00 |
| Motorcycle | 4,000.00 |
| | $13,800.00 |

In Schedule C, Property Claimed As Exempt, debtors claimed exemptions in the amount of the declared values of the automobile, truck, motorcycle, jewelry, firearms, clothing, and household goods. They also claimed an exemption of $1.00 in their residence. However, as the security interests burdening said realty are in excess of its value, we question the propriety of this exemption. Debtors cannot take an exemption in equity that does not exist. *In re Simonson*, 758 F.2d 103 (3d Cir.1985).

Schedule D, Creditors Holding Secured Claims, listed Midland Mortgage Company as holding a first mortgage against their residence in the amount of $43,000.00.

Zelie Consumer Discount Company also is listed on Schedule D as holding a second mortgage against the residence in the amount of $19,934.00. Michael Gavita first borrowed money from Zelie Consumer in 1981 or 1982. Zelie was granted a second

mortgage in 1994 when Michael Gavita borrowed an additional $4,000.00 to purchase a truck. This amount was "rolled over" into the previous unpaid balance owed to Zelie.

Schedule D also lists City of Pittsburgh Employees Credit Union as having a claim in the amount of $10,668.00. The claim was secured to the extent of $3,800.00, the amount in a savings account Michael Gavita had with the credit union. The remaining $6,868.00 is listed as unsecured. Michael Gavita has owed a debt to the credit union on a continuing basis since 1980 or 1981, when he borrowed money for the first time to purchase an automobile. Since then he has borrowed money to purchase a motorcycle, an engagement ring for Mrs. Gavita, and to finance several personal trips by Mrs. Gavita to Ohio, Arizona, and Florida. The debt owed to the credit union was never paid down to zero at any time. Each loan from the credit union was "rolled over" into the previous outstanding balance.

Schedule F, Creditors Holding Unsecured Nonpriority Claims, lists debts in the amount of $43,952.00.[1]

Prior to June of 1993, Michael Gavita owed more than $7,000.00 to Citibank, VISA, Discover Card, and Sears. In June of 1993, he borrowed the sum of $8,000.00 from Commercial Credit to consolidate and pay off these debts.

Debtors were "broke" after paying their bills and had to make credit purchases and obtain cash advances to meet living expenses. According to Michael Gavita, they often had less than $20.00 to live on towards the end of the month. Almost immediately after paying off their above balances, debtors began charging purchases of consumer goods to these accounts.

Within two months after borrowing $8,000.00 from Commercial Credit, debtors began using their VISA card to purchase clothing. They last used it in May of 1994, the month they filed for bankruptcy. The amount owed to VISA is listed as $1,746.00. They used their Discover Card for cash advances and to pay for several motorcycle trips they took. It also was last used in May of 1994. The amount owed to Discover Card is $1,869.00. Finally, debtors used their Sears account to purchase household good and clothing. The amount owed to Sears is $1,100.00.

Debtors borrowed money from The Associates in 1993 to replace fourteen windows in their marital residence. The reason offered for the purchase was that the windows were old and in poor repair. As a result, debtors testified, heat went out the windows and their gas bill was high at $75.00 per month. Curiously, after the window replacement, their gas bill was $85.00 per month. The cost of the windows and their installation was $7,000.00. The total amount due and owing to The Associates, including interest, is $12,247.00.

Michael Gavita also had an account at Kaufmann's department store. Debtors used it in 1993 to purchase clothing and furniture. The amount of the debt is $698.00.

Two other debts are listed on Schedule F. Leslie Gavita owes the sum of $392.00 for a school loan. Michael Gavita owes $8,000.00 to an individual as a result of a motor vehicle accident in which judgment was entered in December of 1992. Apparently he had neither insurance covering this liability nor the financial responsibility to pay for the damage sustained.

Schedule I, Current Income, lists total monthly net income of $2,758.00. Michael Gavita's net monthly income from his full-time job with the City of Pittsburgh is listed as $1,477.00. However, he testified that it approximated $1,700.00. His net monthly income from his part-time job as a service station attendant is listed as $381.00. Leslie Gavita's net monthly income from her job with Burlington Coat Factory is listed as $900.00.

Schedule J, Current Expenditures, lists the following monthly expenses:

---

1. The debts listed on Schedule D do not include portions of the claims by Zelie and City of Pittsburgh Credit Union that are unsecured.

| Mortgage Payment, Taxes, Insurance | $ 780.00 |
|---|---|
| Utilities | 50.00 |
| Cable Television | 40.00 |
| Home Repair | 80.00 |
| Food | 400.00 |
| Clothing | 250.00 |
| Laundry/Dry Cleaning | 45.00 |
| Medical Expenses | 50.00 |
| Transportation | 120.00 |
| Recreation | 75.00 |
| Charitable Contributions | 80.00 |
| Auto Insurance | 75.00 |
| Motor Vehicle Repairs | 100.00 |
| Day Care | 400.00 |
| | $2,715.00 |

Much of the above was unexplained and contradicted by the debtors' testimony. No detail was offered regarding "home repair" at $80.00 per month or $960.00 annually except that their home is in good repair. They spend $250.00 per month or $3,000.00 annually for clothing but Schedule B indicates the value of their clothing at "$200.00". It is common knowledge that the City of Pittsburgh provides medical coverage to its employees but debtor's spend $50.00 per month or $600.00 annually for medical expenses. Debtors own three (3) motor vehicles; however, Mrs. Gavita spends $120.00 per month for a bus pass. Debtors subscribe to cable TV plus "The Movie Channel"; however, they generally rent three (3) movies a week and expend sometimes as much as $100.00 per week renting movies. Debtors do not believe their expenses for day care ($400.00 per month) will diminish when their child starts school and they spend approximately $100.00 per month for diapers for their healthy 3–year old child.

The cost of keeping a roof over their head exceeds fifty percent (50%) of their net income but they don't feel less costly accommodations are available. No detail is offered regarding the $1,200.00 annual motor vehicle repairs. As previously stated, much of debtors' budget is unexplained.

Included among debtors' amended schedules and statements was a declaration of intention to reaffirm the debts owed to Midland, Zelie Consumer Discount, and City of Pittsburgh Employees Credit Union.

After conducting the § 341 meeting of creditors, the chapter 7 trustee reported on July 25, 1994 that no property was available from the estate for distribution to creditors over and above that exempted by debtors.

On August 3, 1994, debtors reaffirmed their obligation to Kaufmann's department store.

On September 6, 1994, the United States trustee brought a motion to dismiss debtors' chapter 7 petition pursuant to § 707(b) because debtors allegedly had purchased consumer goods far in excess of their ability to repay and, based upon the totality of debtors' circumstances, their proposed budget allegedly was excessive and unreasonable. According to the United States trustee, granting debtors relief would be a "substantial abuse" of the provisions of chapter 7 of the Code. Debtors deny this allegation.

On September 26, 1994, twenty (20) days after the U.S. Trustee requested this court to dismiss this petition, debtors moved for permission to amend Schedule I and Schedule J. They aver that Michael Gavita recently lost his part-time job as a service station attendant and that they therefore must decrease the amount of their net monthly income on Schedule I by $381.00 from $2,758.00 to $2,377.00. They further wish to amend Schedule J to reflect a decrease in monthly expenses from $2,715.00 to $2,465.00. Specifically, they propose to reduce monthly clothing expenditures from $250.00 to $100.00; to reduce recreation expenses from $75.00 to $25.00; and to reduce expenditures for repairs to motor vehicles from $100.00 to $50.00. As previously stated, these changes merely appear to the court to be a rearrangement of numbers to fit into debtors' defense to the trustee's motion. At trial these expenditures were necessary to debtors' work or lifestyle. On paper they are reductions in numbers.

An evidentiary hearing was held on both motions. Both sides were given an opportunity to offer evidence on the issues raised by the motions.

## –II–

## ANALYSIS

Section 707(b) of the Code provides in pertinent part as follows:

(b) After notice and a hearing, the court, on its own motion of on motion by the

United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b).

It is not disputed that a hearing was held on the United States trustee's motion after ample notice and that the debts from which debtors seek relief are primarily consumer debts.

"Consumer debt" is defined in the Code as "debt incurred by an individual primarily for a personal, family, or household purpose". 11 U.S.C. § 101(8). With the possible exception of the $392.00 unpaid school loan owed by Leslie Gavita and the debt of $8,000.00 owed by Michael Gavita incurred in connection with a motor vehicle accident, all of the debts incurred by debtors are for personal, family, or household purposes.

■ The issue that must be decided is whether granting debtors the relief requested—i.e., a general discharge of their debts—would be a "substantial abuse" of the provisions of chapter 7 of the Code.

As noted, the United States trustee maintains that debtors incurred debt in making consumer purchases that far exceed their ability to repay and avers that their family budget is excessive and unreasonable. Debtors deny these allegations. They insist that they truly believed they were able to repay their debts when they made these consumer purchases and deny that their family budget is unreasonable or excessive. The totality of the circumstances, including debtors' debt structure and funds available to pay same, leads the court to a contrary conclusion. Either debtors knew when the debts were incurred that they could not or would not pay them or they chose to ignore the obvious.

Section 707(b) was added to the Code in 1984 in response to pressure from retailers and consumer lenders who complained about an ever-increasing number of individual chapter 7 bankruptcy filings. See In re Green, 934 F.2d 568, 570 (4th Cir.1991). The provision introduced an additional restraint upon a debtor's ability to obtain chapter 7 relief by allowing a bankruptcy court "to deal equitably with the situation in which an unscrupulous debtor seeks to take unfair advantage of his creditors". Id. at 570.

The Code does not define "substantial abuse". Moreover, there appears to be no bright-line test for determining when substantial abuse would occur. The consensus of courts that have considered the matter is that this determination must be made on a case-by-case basis and depends on the totality of the circumstances. See In re Green, 934 F.2d at 572; In re Krohn, 886 F.2d 123 (6th Cir.1989); In re Walton, 866 F.2d 981 (8th Cir.1989).

■ The following considerations may be probative in making this determination in a given instance:

(1) whether the chapter 7 petition was filed as a result of sudden illness, disability or unemployment;

(2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) whether the debtor's proposed family budget is excessive and unreasonable;

(4) whether the debtor's schedules and statements of current income and expenses reasonably reflect the true financial situation; and

(5) whether petition was filed in good faith.

See In re Green, 934 F.2d at 572.

The circumstances of the present case compel the conclusion that granting debtors the relief they seek would be a substantial abuse of the provisions of chapter 7. The conclusion is inescapable: debtors, even immediately prior to the filing, ran up bills they knew they could not pay.

There is no indication that debtors' financial distress was a result of an unforeseeable calamity such as sudden illness, disability, or unemployment. Debtors and their young daughter appear to be in good health. Both debtors hold full-time jobs which, unfortunately for them, do not pay well enough for them to maintain their lifestyle.

Their financial plight is not due to any misfortune or catastrophe that unexpectedly

befell them. To the contrary, debtors were living beyond their relatively modest means for a protracted period of time before they filed for bankruptcy. They were unable both to pay their debts as they became due and to have enough money on which to live. When they ran short of money on which to live, debtors blithely incurred additional debt. Like a house of cards, everything eventually collapsed.[2]

Debtors were caught in an ever-escalating vicious cycle. Because they could not afford to pay their bills, debtors felt compelled to incur yet more debt. Their predicament grew steadily worse over time. They repeatedly borrowed from creditors without ever paying off the debt already owed.

For instance, Michael Gavita has had a line of credit with the City of Pittsburgh Employees Credit Union since 1980 or 1981. He has borrowed against that line of credit on numerous occasions without ever paying the balance in full. Each borrowing was added to the previous ones.

Michael Gavita also has borrowed from Zelie Consumer Discount on several occasions since 1980 or 1981. When he felt the need to make a consumer purchase for which he lacked the funds, Michael Gavita would borrow that amount and thereby increase the indebtedness already owed to Zelie. For example, he borrowed $4,000.00 from Zelie in 1994, only months before filing for bankruptcy, to purchase a truck. The debt was added to the outstanding balance already owed to Zelie.

Perhaps the most compelling indication that debtors incurred debt far beyond their ability to repay occurred when Michael Gavita borrowed $8,000.00 from The Associates in June of 1993 to pay off debts owed to Citibank VISA, the Discover Card, and Sears. Within just a few months of so doing, debtors resumed making purchases on those accounts because they could not meet their living expenses after paying their bills. They incurred an additional $4,715.00 in debt on top of the debt owed to The Associates. The

balance owed VISA is $1,746.00. The balance owed to the Discover Card is $1,869.00. The balance owed to Sears is $1,100.00.

Debtors' insistence that they honestly believed they could repay these latter debts is refuted by the fact that charges were made on VISA and the Discover Card in the very same month as they filed for bankruptcy. Debtors knew (or should have known) long before May of 1994 that they could not pay off the debts they continued to incur. There are no credible facts indicating that their situation suddenly went from good to bad, though Michael Gavita suggests that this occurred earlier than 1993.

Other considerations also indicate that granting debtors relief would be a substantial abuse of the provisions of chapter 7. For instance, there is reason to question whether debtors' schedules and statements accurately reflect their true financial situation. Michael Gavita testified under oath that a debt was owed to Sears and that debtors knowingly did not schedule Sears as a creditor because they did not want to "lose" the account. Debtors evidently desire to continue using the account during their bankruptcy to make consumer purchases. This "oversight" leads one to wonder whether there are other creditors whom debtors have chosen not to schedule.

Finally, the evidence presented strongly suggests that debtors' petition was not filed in good faith.

Debtors incurred substantial debt long after it had become apparent that they could not repay their obligations. As noted, debtors incurred considerable debt in 1994, some in the very month they filed for bankruptcy. This conduct indicates that debtors incurred this debt with the idea that they would relieve themselves of any obligation to repay by obtaining a general discharge in bankruptcy.

Also, debtors have reaffirmed their obligations to Midland Mortgage, Zelie Consumer Discount, The City of Pittsburgh Employees Credit Union, and Kaufmann's. With the exception of Kaufmann's, all of these credi-

2. Although the timing of this termination is curious and this fact was offered to bolster a legal argument, the loss of Mr. Gavita's part-time job as a service station attendant is not probative in this regard, as it occurred after the bankruptcy filing. In addition, it is not credible to aver that this particular position is the only one available in debtor's work area.

tors are secured either in debtors' marital residence or their savings account. Debtors obviously have assessed their situation and have decided that these creditors must be appeased because of their secured status. With the apparent exception of the debt owed to Kaufmann's, debtors evidently seek to have all of their scheduled general unsecured creditors discharged. No assets are available for distribution. Accordingly, these latter creditors will receive nothing from debtors' estate and will be turned away empty-handed if debtors are granted the relief they sought in filing for bankruptcy. Debtors' all-or-nothing approach in which they favor certain creditors by paying them in full while paying the remainder nothing is impermissible and demonstrates bad faith on their part.

Dismissal of debtors' chapter 7 petition is appropriate in light of the above circumstances. Accordingly, there is no need to consider debtors' request for permission to alter Schedule I and Schedule J of their petition. As detailed previously, we do not find the schedules explained or credible.